IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VIRGIE PORTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.   04 C 6009 |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART | ) | HONORABLE DAVID H. COAR |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Virgie Porter applied for disability insurance benefits ("DIB") from the Social Security Administration ("SSA"). After the SSA denied her application and her reconsideration request, Plaintiff asked for a hearing. The Administrative Law Judge ("ALJ") who conducted the hearing concluded that Porter was not disabled. After the Social Security Appeals Council denied Porter's request for review, she sought judicial review of the ALJ's decision. Porter and the SSA Commissioner, Jo Anne Barnhart, have filed cross-motions for summary judgment seeking to reverse or remand, respectively, the ALJ's decision. For the reasons discussed below, this Court reverses the ALJ's decision and remands for further proceedings consistent with this opinion pursuant to sentence four of the judicial review statute. 42 U.S.C. § 405(g).

**RELEVANT FACTS**[1]

**Porter's Testimony**

Virgie Porter was born on February 11, 1948. She is single and lives alone. A friend occasionally stays with her, cooks and cleans for her, and drives her to appointments and the store. Her only child died of a heart attack in 1999, at age thirty-one. Porter has a high school education. From approximately 1975 until 1988, she worked for a hospital, doing billing and collections. The hospital fired her over alleged attitude problems and reportedly told her she had a personality disorder. Some time thereafter, Porter became a home care provider for adults. In 1994, Porter dislocated her left shoulder at work. She applied for disability benefits because of her shoulder injury in 1994, but was denied. Porter continued to provide home care until 1999 or 2000.

In 1995, Porter started a commercial cleaning service, which provided janitorial services for commercial office buildings. As owner, Porter supervised approximately three to four employees on four hour cleaning shifts, six days per week. Porter did some light cleaning work, like dusting, and would fill in when employees failed to report to work. She reported that shoulder pain and fatigue often affected her, and that she would lie on the floor of one of the offices and rest for a portion of the shift. This business ended in approximately 2000, when she lost her primary contract. Porter subsequently bid on several other cleaning contracts, including one at the House of Blues in Chicago. Because of pain that she described as rendering her unable

---

[1] Unless otherwise noted, all facts are taken from the certified copy of the administrative record filed with this Court.

to function, however, she feared that she would not be able to fill in if one of her employees failed to show. She stopped submitting bids. Porter has not worked since August 10, 2000.

Porter has hypertension, adult onset diabetes, shoulder pain relating to her 1994 injury, depression, and personality disorder. Her shoulder causes constant pain and she reported that she had developed arthritis in both the left and the right shoulder. The shoulder pain increases when she lifts her left arm, sometimes to the point that she is unable to use the arm. She was diagnosed with diabetes in 2001, which sometimes causes her to feel sick after eating. In addition, she reports feeling very depressed, having memory lapses, difficulty concentrating, and being easily irritated. She cooks very infrequently because she will sometimes fall asleep or forget that she has turned on the stove, and burn things. In addition, she reports having no real friends, experiencing no fun, and was unable to recall the last time she really laughed. Porter reports auditory hallucinations, describing them as like a butterfly flapping its wings near her ear or a fan. On most nights, she gets one or two hours of sleep. During the day, she says nothing really interests her. She sometimes reads or will watch a portion of the news or The Price is Right game show. She does household chores sometimes, but reports difficulty. Her friend will sometimes do laundry for her and tell her to put it in the dryer, which she frequently forgets or fails to do. She drives sometimes, although she reports that she forgets to observe traffic signals. Occasionally, she drives to the casino in Hammond, Indiana, where she knows people and sits for an hour or two.

**PORTER'S MEDICAL HISTORY**

**Cook County Hospital**

From 1992 to 2001, Porter made repeated visits to the Cook County Hospital emergency room ("ER") to get refills of her hypertension medication. Each time, she received a prescription for her medication and was directed to follow up with her regular physician or the Hypertension Clinic at the hospital. On multiple occasions, the records indicate that staff made appointments for Porter at the Hypertension Clinic, although subsequent records reflect that Porter missed several appointments. On January 16, 2001, Porter went to the Hypertension Clinic complaining of a pricking and burning sensation on the skin of her right thigh and leg. Blood tests reflected an elevated blood glucose level and she was diagnosed with diabetes by Dr. Barbara Kenny.

**Medical Evaluations for Disability Determination**

As part of her application for DIB, Porter was seen on March 16, 2001, by Peter Biale, M.D., who spent 40 minutes examining her. Dr. Biale noted that Porter's range of motion and sensory responses were limited on her left side. She had full range of motion on her other joints and was able to both heel and toe walk. Her gait was normal, she was able to squat down, and her finger grasp and hand grip were unimpaired. Biale also administered a mini-mental examination, and reported a possibility that Porter had "some delusional thinking regarding multiple pains ... in her body." (R. 168). He noted she admitted to auditory hallucinations. In addition, Porter's immediate memory was poor. She had difficulty with backward digit recall and remembered only one of three words. Her recent memory was poor. She could not remember what she had eaten for dinner the preceding night and reported that her friend brought her to the clinic because otherwise she "gets lost." Biale characterized her intellectual functioning as

"poor," noting that she did not know how many weeks were in a year and could name only one large city. Although she was able to add and multiply, she had difficulty subtracting. According to Biale, Porter "may be marginally capable of managing her own funds." (R. 169). Finally, Biale gave his clinical impression of Porter's impairments, listing hypertension, diabetes mellitus Type II, limited motion of the left shoulder, depression, and low back pain. Specifically, he stated that Porter "is basically depressed." She is "unable to sleep ... has auditory hallucinations and lack of concentration." Her "immediate and recent memory appears to be impaired." (R. 169). Porter also had an x-ray taken of her left shoulder, which revealed "moderate degenerative changes at the acromion with some sclerosis." (R. 171).

A psychiatric evaluation was conducted by John W. O'Donnell, M.D., on April 2, 2001. Dr. O'Donnell reported that Porter was a "poor historian," providing "vague" and "rambling explanations" of her medical and psychiatric history. In his report, O'Donnell stated that Porter complained of difficulty sleeping, a burning sensation at the tops of her thighs, and numbness on the bottoms of her feet. Porter narrated that these problems started after the death of her son in December 1991.[2] O'Donnell described Porter as having "a mild pressure of speech," and going off into "rambling stories." (R. 175). In addition, he characterized her as having "some vague paranoid ideation, but no definite paranoid delusional system." Porter denied any history of auditory, visual, or tactile hallucinations, although she described hearing "various noises in the house," when she lies down. After his examination, O'Donnell reported that Porter was able to

---

[2] Elsewhere in the record, the date of Porter's son's death is given as December 1999. Porter's attorney for her hearing before the ALJ described her son's death as having occurred "some 12 years ago."(R. 212) Porter, however, indicated that her son died in December 1999 on her Activities of Daily Living Questionnaire. This Court will use December 1999 as the date.

repeat six numbers forward and four numbers backward, and could recall five out of five items immediately and three out of five after five minutes. Porter remembered how she got to the appointment and what she ate for dinner the preceding evening. She named five large cities in the United States, one famous person, and knew how many weeks are in a year and how many nickels are in $1.15. She was able to add and multiply. O'Donnell characterized Porter as "capable of managing her own funds." (R. 177). He diagnosed her as having pain disorder with both psychological factors and medical conditions and a mood disorder with depressive features and anxiety, secondary to medical complaints. Along axis #2, he diagnosed Porter with personality disorder not otherwise specified ("NOS"). His diagnosis along axis #3 was diabetes, hypertension and left shoulder injury. In both his summary and prognosis sections, he described Porter's prognosis as "guarded." (R. 177).

Subsequently, Tyrone Hollerauer, Psy.D., a Department of Disability Services psychologist, evaluated Porter's disability application file to provide a Residual Capacity Assessment. He characterized her as moderately limited in her ability to sustain an ordinary routine without supervision, mild to moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, in her ability to ask simple questions or request assistance, and in her ability to accept instructions and respond appropriately to criticism from supervisors. In his narrative functional capacity assessment, he described her as experiencing "persistent sadness" following the death of her son and having somatic complaints related to both psychological and medical issues. Hollerauer additionally noted that Porter was "angry, irratable [*sic*] and a loner. She does not get along with others well" and has chosen to leave a job "rather than submit to authority." (R. 180). In the Documentation

of Factors that Evidence the Disorder section of his report, Hollerauer wrote that Porter had a medically determinable impairment that did not precisely satisfy the diagnostic criteria printed on the report form. His handwritten description stated that she suffered from a mood disorder with depressive and anxious features, secondary to her medical complaints. In addition, he described her as suffering from a somatoform disorder characterized as pain disorder secondary to psychological-medical complaints. In the Personality Disorders section, he checked the box for "[i]nflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, as evidenced by ... pathologically inappropriate suspiciousness or hostility." He also put a mark in the box for "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior." (R. 189). Finally, Hollerauer rated Porter as mildly restricted in her activities of daily living, having moderate difficulties in maintaining social functioning, having mild difficulties in maintaining concentration, persistence, or pace, and having suffered one or two repeated episodes of decompensation, each of extended duration.

Dr. Young-ja Kim, a Department of Disability Services physician, completed a physical residual functional capacity assessment on May 3, 2001, in which she reported that Porter was limited to occasionally carrying up to 50 pounds, frequently lifting or carrying no more than 10 pounds, and standing, walking, or sitting about six hours out of an eight-hour workday. Dr. Kim noted moderate degenerative changes of Porter's left shoulder and possible rotator cuff disease. Also on May 3, 2001, Robert England, M.D., reviewed all the evidence on file and approved Dr. Kim's assessment.

**OTHER EVIDENCE**

**Activities of Daily Living Questionnaire**

During the DIB determination process, Porter filled out an Activities of Daily Living Questionnaire, describing her daily activities. She indicated that a friend cooks her meals and that she sometimes cooks in the microwave. According to Porter, she dusts around the house about once a week and sometimes picks up paper from the yard and waters the lawn. She goes grocery shopping weekly for light food.[3] She reported that she had problems doing laundry, folding clothes, lifting items, cooking (handling pots, leaving the stove on, burning food because she forgot to monitor it). In addition, she indicated that she had difficulty combing and shampooing her hair because of pain and stiffness in her left shoulder and back. As for her memory and concentration levels, Porter reported that she had had difficulty remembering job duties, which led to her termination, that she would forget to turn off the stove, and that she misplaced medicines, mail, money and clothing. In addition, she indicated that she sometimes thought people were following her and spying on her, but that she didn't know why she thought this. Prior to the death of her son in December 1999, she indicated that she had had a "pretty good memory" and had functioned "ok." As of the time of the questionnaire, however, she often got upset when people told her to do something, and described herself as "temperamental at times."

---

[3] Porter wrote that she shopped for "Food (light)," which could mean lightweight food items or low calorie food items. Given other information in the record describing Porter's grocery shopping as limited to small amounts of food that she could carry despite her shoulder pain, it is reasonable to infer that this notation means she shops for small amounts of lightweight food items.

**ADMINISTRATIVE LAW JUDGE HEARING**

**Abb Locke's Testimony**

Abb Locke testified that he and Porter had been friends for approximately 20 years. He stated that Porter was unable to work because she was "shaking" and had shoulder pain. In addition, he reported that her mind had been going, that she was forgetful, needed someone to take her places because she couldn't always drive herself, and sometimes forgot what she was talking about in the middle of a conversation. Locke stated that he cooked and cleaned and went to the store for Porter. He prepared meals and left them for her to reheat in the microwave, helped with household chores like vacuuming and sweeping, did laundry and some yardwork. When she had doctor's appointments, he reminded her of them, and took her and waited often more than two hours for her to be seen.

**Vocational Expert's Testimony**

Vocational Expert ("VE") Michael Komie, Ph.D.[4] also testified at the hearing. He characterized Porter's work in billing and collections as semi-skilled and sedentary, her work as an owner/supervisor of a commercial cleaning service as light and semi-skilled, and her work as a home-care aide as unskilled and light. The ALJ presented the VE with a hypothetical of an individual of Porter's age, education, and vocational background who could on occasion lift or carry 20 pounds, stand, sit or walk for six hours of an eight-hour workday, but could not use her left arm above shoulder height and who should avoid contact with the public and have only limited contact with co-workers and supervisors. The VE testified that such an individual could

---

[4] The VE's name is spelled differently throughout the record. This Court uses the spelling on his curriculum vitae. (R. 36-42).

perform the commercial cleaning service work, if it was a night job where the public was not present, or could do billing work but not collections. The ALJ then asked about an individual who was moderately impaired in her ability to work within a schedule and be punctual. The VE testified that the billing work would be impacted but the cleaning service would not. In response to the ALJ's further limitation that the individual needed to lie down throughout the day because of pain, the VE stated that this would present a "rehabilitative situation that could not be full-time competitive employment" and would preclude a job without a "rehabilitation placement." (R. 270).

**The Administrative Law Judge's Decision**

To determine whether Porter was disabled as defined in the Social Security Act, the Administrative Law Judge Michael R. McGuire conducted the standard five-part inquiry. 20 C.F.R. § 404.1520. This required the ALJ to evaluate:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995) (quoted in *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)). An answer of "no" at any step, except Step 3, ends the inquiry and results in a finding that the claimant is not disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir.1985) (citation omitted). The claimant bears the burden of proof through step four; but at step five the burden shifts to the Commissioner. *Knight*, 55 F.3d at 313.

In conducting the sequential analysis, the ALJ found that Porter had not engaged in substantial gainful activity since August 10, 2000. He also found that Porter had "at least one

-10-

medically determinable severe impairment," including hypertension, non-insulin dependent diabetes mellitus, osteoarthritis of the left shoulder, a personality disorder NOS, a mood disorder with depressive features and anxiety secondary to medical complaints, and a pain disorder with both a medical condition and psychological factors. But the ALJ found that none of Porter's impairments, either singly or in combination, was severe enough to meet or medically equal one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

The ALJ then considered whether Porter had sufficient residual functional capacity to perform her past relevant work or other work existing in significant numbers in the national economy. It is unclear how the ALJ weighed the medical evidence in the record, or how he weighed the credibility of Porter's testimony at the hearing or that of her friend, Abb Locke. The fifth page of the ALJ's opinion is missing from the record, and the Defendant certified that the Social Security Administration has been unable to locate it, despite several search attempts. In his findings section, the ALJ found the claimant's allegations about her limitations "not totally credible for the reasons set forth in the body of the decision."[5] (R. 20). In addition, he found that Porter "has the residual functional capacity to lift and carry (or push/pull) up to 10 pounds frequently and 20 pounds occasionally and to sit, stand, and walk up to 6 hours of an 8-hour workday. However, the claimant is not able to use her non-dominant left upper extremity above shoulder height, must avoid contact with the public, and can have only limited contact with co-workers and supervisors." *Id*. However, he found that she could still perform her past relevant work as owner/supervisor of a commercial cleaning service. In conclusion, the ALJ determined

---

[5] As noted, page five of the opinion is missing. There is no credibility analysis of Porter's testimony in the remaining portion of the opinion.

that Porter was not under a disability as defined in the Social Security Act and was not entitled to benefits.[6]

Porter sought review of the ALJ's opinion from the Appeals Council and submitted a new medical evaluation as support. The Appeals Council denied Porter's request for review on September 2, 2004. The Order of Appeals Council listed the additional evidence it had made part of the record as Porter's "Representative's Brief dated August 14, 2004." (R. 8) This "brief" was a letter from Porter's former counsel, Andrew Barone, to the Appeals Council, which described the alleged errors in the ALJ's decision and referred to "a psychiatric evaluation of the Illinois Department of Human Services [which] was sent on November 18, 2003." (R. 206) According to Barone, the evaluation reported that Porter had a [Global Assessment of Functioning] GAF of 46 and had highly symptomatic depressive and anxiety-related symptoms. *Id*. Although Barone's letter indicated that it included an enclosure, neither the psychiatric evaluation referred to nor any other document can be found in the record and there is no evidence that the Appeals Council considered anything but the letter.

In support of her motion for summary judgment, Plaintiff submits a psychiatric evaluation, conducted by a doctor at the Illinois Department of Human Services' Client Assessment Unit on or around July 18, 2003,[7] described Porter as "distractible, forgetful, irritable and explosive" and noted that she had "almost set the house on fire with cooking." The

---

[6]Because the ALJ found that Porter was able to perform her past relevant work, he did not reach the fifth step of the disability evaluation. 20 C.F.R. § 404.1520.

[7] The name stamp of the attending psychiatrist who completed all or part of the form was unclear. Her first name was Deborah and she was an attending psychiatrist in the Department of Child and Adolescent Psychiatry at John H. Stroger, Jr. Hospital of Cook County.

evaluation gave a prognosis of "fair" and a global assessment of functioning ("GAF") rating of "42." (Pl.'s Mtn. for Summ. J., Ex. A; R. 206) It is unclear from the record whether this was the same evaluation that was submitted to the Appeals Council.

**STANDARD OF REVIEW**

The district court will uphold the ALJ's decision as long as the ALJ's findings of fact are supported by substantial evidence and there are no errors of law. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The district court reviews the entire administrative record, but does not reweigh evidence, resolve conflicts, decide credibility questions, or substitute its own judgment for that of the Commissioner. *Clifford*, 227 F.3d at 869. This is a "deferential, but not entirely uncritical" standard of review, because the ALJ's decision will not stand "if it lacks evidentiary support or [contains] an inadequate discussion of the issues." *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).

**ANALYSIS**

Porter alleges that the ALJ's decision is based on errors of law and is not supported by substantial evidence. Specifically, she alleges that the ALJ selectively relied on only the evidence that supported his ultimate conclusion that she was not disabled, failed to adequately explain his evidentiary analysis, and failed to explain the reasons for his credibility findings. In addition, Plaintiff asserts that she submitted new and material evidence to the SSA which should have been considered in connection with the SSA's review of the ALJ's decision. Plaintiff seeks a sentence four reversal of the ALJ's decision and an award of benefits, or in the alternative, a

remand for further proceedings in accordance with this Court's decision. The Commissioner denies that the ALJ committed an error of law or failed to support his findings with substantial evidence. Because page five of the ALJ's decision is missing from the record, however, the Commissioner concedes that additional proceedings before the Commissioner are warranted. Accordingly, the Commissioner requests a remand. As to Plaintiff's request for an award of benefits, the Commissioner argues that Plaintiff is not entitled to such benefits.

The Seventh Circuit has stated that the ALJ need not discuss every piece of evidence in the record but must base her decision on all of the relevant evidence. In addition, the ALJ must articulate, even briefly, her analysis of the evidence. *Herron*, 19 F.3d at 333. If the ALJ rejects an entire line of evidence, she must provide a reason for that decision. *Id*. Plaintiff complains that the ALJ rejected the testimony of Abb Locke about her declining mental capacity and about her physical limitations from her medical conditions. In addition, Plaintiff argues that the ALJ failed to analyze or discuss other "potentially critical" pieces of evidence, including Dr. Biale's report on his mini-mental examination of Porter. More importantly, Plaintiff contends that the ALJ ignored the portion of the VE's testimony in which the VE conceded that if Porter's testimony about her inability to complete a four-hour cleaning shift without lying down was credited, he would assess her as unable to work without a rehabilitative assignment. As a result, the ALJ failed to build a logical bridge from the evidence to his conclusion in this case. *See Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) ("We require the ALJ to build an accurate and logical bridge from the evidence to her conclusions so that we may afford the claimant meaningful review of the SSA's ultimate findings.").

Although the ALJ mentions the relevant medical evidence, including Dr. Biale's report, he provides almost no explanation of how he reasoned from that evidence to his conclusion that Porter was only mildly limited by her impairments. Indeed, he bases his determination on claimant's testimony about her day-to-day activities, despite medical and testimonial evidence that claimant suffered memory lapses and was an unreliable historian. Yet in his findings section, the ALJ found the claimant's testimony not totally credible. There is nothing in the portion of the decision in the record to support this finding, although the Seventh Circuit requires that the ALJ provide reasons for a credibility determination "so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski*, 322 F.3d at 916.

Given the incompleteness of the record, this Court is unable to reverse the ALJ decision and award benefits to Porter. The Court reaches this conclusion with great reluctance because the loss of a portion of the ALJ's decision prejudices Porter by delaying an ultimate decision on her claim and forcing her to relitigate at least part of that claim. That portion of the ALJ's decision that is contained in the record displays a lack of analysis or logical link between the evidence and the ALJ's ultimate findings. Indeed, this Court finds the ALJ's discussion of the medical evidence and his decision not to credit Porter's testimony frankly incredible. The ALJ's decision must do more than simply recite the mantra "[a]ll of the medical opinions in the record regarding the severity of the claimant's impairments have been carefully considered." From the evidence before this Court, it is not at all clear that all the evidence was considered, much less carefully considered, in this case. This Court finds that there is not substantial evidence supporting the ALJ's decision, based on the incomplete record before it. Accordingly, Plaintiff's motion for

summary judgment and Defendant's motion for summary judgment are granted in part and denied in part. This Court reverses the ALJ's finding and remands the matter pursuant to sentence four of the judicial review statute, 42 U.S.C. § 405(g), for additional proceedings consistent with this opinion.

## Conclusion

For the foregoing reasons, this Court reverses the ALJ's finding and remands the matter pursuant to sentence four of the judicial review statute, 42 U.S.C. § 405(g), for additional proceedings consistent with this opinion.

Enter:

/s/ David H. Coar

———————————————————
David H. Coar
United States District Judge

Dated: **March 23, 2006**